UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

EES COKE BATTERY, LLC,

      Plaintiff,

v.

MICHIGAN OCCUPATIONAL SAFETY
AND HEALTH ADMINISTRATION,

      Defendant.

_____/

Case No. 06-15069

Honorable Nancy G. Edmunds

**ORDER (1) DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT [9], AND
(2) DENYING PLAINTIFF'S MOTION TO STRIKE [13]**

This matter comes before the Court on Plaintiff EES Coke Battery, LLC's motion for

summary judgment in its favor in this declaratory judgment action filed against Defendant

Michigan Occupational Safety and Health Administration ("MIOSHA"). Plaintiff filed the

instant motion on May 1, 2007, and Plaintiff's underlying suit seeks to bar Defendant from

enforcing four citations brought against Plaintiff that arose out of a fatal railroad derailment

accident at Plaintiff's industrial facility. Specifically, Plaintiff claims that the Federal Railroad

Administration ("FRA") has exclusive jurisdiction to issue citations for railroad safety

infractions such as those alleged here, and that Defendant is preempted from taking such

actions under the Supremacy Clause of the U.S. Constitution. U.S. Const. art. VI, cl. 2.

On June 22, 2007, Plaintiff also filed a motion to strike a document attached as an exhibit

to Defendant's response to Plaintiff's motion for summary judgment. For the reasons set

forth below, the Court DENIES Plaintiff's motion for summary judgment, DENIES AS

MOOT Plaintiff's motion to strike and GRANTS judgment in favor of Defendant in the underlying action.

## I. FACTS

Plaintiff operates an industrial facility on Zug Island, close to River Rouge, Michigan, that is called a coke battery, which "produces coke and other products used in steel making."[1]  (Pl.'s Mot. for Summ. J. (hereinafter, "Pl.'s Mot.") at 1.)  Railcars transport the finished coke to steel mills in the eastern U.S., and a company called Delray Connecting Railroad ("Delray") has a contract with Plaintiff to operate the trains that move coke from Plaintiff's facility to Class I railroads, such as Norfolk Southern, CSX and Canadian National, which then deliver the product to its final destinations.  (Pl.'s Mot. at 1; Def.'s Resp. at 1.)  Delray's trains push empty railcars into a coke loading station at Plaintiff's facility, and a hydraulic system called a "dog" that is attached to the tracks then assists in the moving of railcars during the loading process.  Once loading is complete, Delray pulls the cars forward and out of Plaintiff's facility onto the regular tracks which carry the coke to steel mills.  (Def.'s Resp. at 1.)

On the day of the accident leading to this case, a Delray train was pushing empty railcars back into Plaintiff's loading station.  A dog was improperly raised at the time, and the end car derailed upon striking the raised dog.  One of Delray's employees was holding onto the side of the railcar that derailed, and he died when this car pinned him against a support column.  (*Id.*)  Shortly thereafter, investigators from both the FRA and Defendant

---

[1]Coke is produced through a process of baking raw coal, and is used as fuel in blast furnaces that produce steel.  *See* http://en.wikipedia.org/wiki/Coke_%28fuel%29 (last visited July 23, 2007).

examined the scene, and MIOSHA issued citations to both Delray and Plaintiff in August 2005.[2] (*Id.* at 2.) In administrative appeals conducted at the state level, Delray and Plaintiff filed motions to dismiss the citations on the ground that the FRA had exclusive jurisdiction over any safety violations from this accident, and that Defendant was preempted from taking any action of its own. The citations against Delray were dismissed when MIOSHA did not contest that entity's motion to dismiss, and the parties then stipulated to hold the state administrative case involving Plaintiff and Defendant in abeyance in order for Plaintiff to bring the instant declaratory judgment action in this Court to settle the issue of whether the FRA preempts any action by Defendant. (Pl.'s Mot. at 1-2.)

## II. STANDARD OF REVIEW–MOTION FOR SUMMARY JUDGMENT

Summary judgment is appropriate only when there is "no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The central inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986). Rule 56(c) mandates summary judgment against a party who fails to establish the existence of an element essential to the party's case and on which that party bears the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).

The moving party bears the initial burden of showing the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323. Once the moving party meets this burden, the

---

[2]The FRA report concluded that the employee should not have been riding on the side of a railcar, but that a contributing factor to the accident was Plaintiff's failure to engineer a fix that would keep the dog from raising up improperly. (FRA Report, Pl.'s Mot., Ex. 5.)

non-movant must come forward with specific facts showing that there is a genuine issue for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). In evaluating a motion for summary judgment, the evidence must be viewed in the light most favorable to the non-moving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970). The non-moving party may not rest upon its mere allegations, however, but rather "must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). The mere existence of a scintilla of evidence in support of the non-moving party's position will not suffice. Rather, there must be evidence on which the jury could reasonably find for the non-moving party. *Hopson v. DaimlerChrysler Corp.*, 306 F.3d 427, 432 (6th Cir. 2002).

## III. ANALYSIS

Plaintiff's argument that Defendant is preempted from taking action in connection with the accident at issue in this case arises from the Supremacy Clause of the U.S. Constitution. That document provides that "the laws of the United States . . . shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or the Laws of any State to the Contrary notwithstanding." U.S. Const. art. VI, cl. 2. In addition to laws promulgated by Congress, preemption may also result from regulatory action of federal agencies taken under delegated authority from Congress. *Norfolk & Western Ry. Co. v. Pub. Utils. Comm'n of Ohio*, 926 F.2d 567, 570 (6th Cir. 1991) (quoting *Louisiana Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 369 (1986)). As this Court has noted in a prior preemption case involving the FRA and railroad regulations, there are three ways in which federal law can preempt similar regulation by a state body. *See CSX Trans., Inc. v. City of Plymouth*, 92 F. Supp. 2d 643, 647 (E.D. Mich. 2000). The only one of those three that is at issue in this case is when Congress explicitly defines the extent to

which its pronouncements preempt state law. *English v. Gen. Elec. Co.*, 496 U.S. 72, 78 (1990).

## A. Federal Law Preemption in the Railway Context

Congress enacted the Federal Railway Safety Act ("FRSA") in 1970 in order to promote national regulation of railroad safety. *CSX Transp., Inc. v. Easterwood*, 507 U.S. 658, 661 (1993). The FRSA's purpose is to "promote safety in every area of railroad operations and reduce railroad-related accidents and incidents." 49 U.S.C. § 20101. Under the FRSA, the Secretary of Transportation is entrusted with broad powers to "prescribe regulations and issue orders for every area of railroad safety." 49 U.S.C. § 20103. Another goal of the statute is to ensure national uniformity of railroad regulation, as evidenced by its express preemption provision, which reads:

> Laws, regulations, and orders related to railroad safety shall be nationally uniform to the extent practicable. A State may adopt or continue in force a law, regulation, or order related to railroad safety until the Secretary of Transportation prescribes a regulation or issues an order covering the subject matter of the State requirement. A State may adopt or continue in force an additional or more stringent law, regulation, or order related to railroad safety when the law, regulation, or order -
>
> (1) is necessary to eliminate or reduce an essentially local safety hazard;
>
> (2) is not incompatible with a law, regulation, or order of the United States Government; and
>
> (3) does not unreasonably burden interstate commerce.

49 U.S.C. § 20106. Thus, state laws or regulations touching on railroad safety are saved from being preempted by the FRSA in two situations: (1) when no federal law or regulation covers the same subject matter, or (2) if local safety concerns exist and the resulting state response is not incompatible with federal law, nor unreasonably burdens interstate

commerce.  Although both savings clauses are at issue in this case, the Court will consider them in reverse order, given that the issue of whether federal law covers the subject matter is the more difficult question to answer.

### B.  Local Safety Concerns

Plaintiff argues that Defendant's regulations of railroad safety matters at the state level do not fall within the FRSA's second savings clause because they are not directed at a uniquely local safety hazard by virtue of the fact that Defendant's regulations apply statewide.  *Norfolk & Western Ry.*, 926 F.2d at 571.  Because Defendant does not dispute that its regulations apply across the entire state of Michigan, the second FRSA savings clause is therefore inapplicable to this case.

### C.  Coverage of Federal Law

Federal law can cover a particular subject matter in two ways.  First, Congress or authorized federal agencies may affirmatively enact laws and regulations on a given topic which state that such action constitutes the final disposition of an issue.  This is known as express preemption.  Secondly, the federal government may consider regulating a particular area that falls within its power to act, but specifically decline to do so.  Such a failure to take action is called negative preemption, and is essentially a determination that regulation of that particular area is either unnecessary or not permitted.  *Norfolk & Western*, 926 F.2d at 570-71.  Regardless of whether a case involves express or negative preemption, a reviewing court must first determine whether the subject matter of the applicable federal and state regulation is the same, and then proceed to analyze the question of whether the federal authorities expressed an intent for state law to be preempted under the circumstances.

The inquiry into the subject matter that a state law seeks to regulate is not to be conducted in a strict fashion by focusing on the specific prescriptions or proscriptions that the regulation contains. Rather, "[i]dentifying the safety concerns that a state or federal regulation addresses 'will necessarily involve some level of generalization that requires backing away somewhat from the specific provisions at issue." *CSX*, 92 F. Supp. 2d at 650 (quoting *Burlington N. and Santa Fe Ry. Co. v. Doyle*, 186 F.3d 790, 796 (7th Cir. 1999)).

In relevant part, Defendant cited Plaintiff for the following four violations after its investigation of the subject accident at Plaintiff's coke facility:

> [T]he employer failed to maintain rail car pusher dog in operating condition, exposing employees to car derailment hazards.

> [T]he employer allows employees to work in blind areas around moving rail cars, while rail car moving system operators in pulpit area [are] operating controls without being able to see blind spots of cars to insure employees are clear.

> Where rolling railroad cars on a spur track could make contact with a rail car being loaded or unloaded, repaired or serviced, or enter a building, work or traffic area, derailers, bumper blocks, a blue flag or blue light, or other equivalent protection [were not] used.

> [Defendant observed e]mployees clearing and cleaning coke out of railroad track pusher system without utilizing the power lockout procedures, cleaning dogs of railroad spur tracks . . . .

(Pl.'s Mot. at 12-14 (quoting from the four MIOSHA citations against Plaintiff).) Plaintiff argues that the first two citations are preempted because they are only based upon one of Defendant's General Duty Clauses, which must yield in favor of the FRA's specific regulatory scheme. Regardless of the resolution of that issue, Plaintiff also asserts that FRA regulations preempt all four citations.

**1. The FRA's authority does not constitute a blanket preemption over regulation by Defendant under its General Duty Clauses**

Under the MIOSHA General Duty Clause at issue in this case, all employers shall "[f]urnish to each employee, employment and a place of employment which is free from recognized hazards that are causing, or are likely to cause, death or serious physical harm to the employee." Mich. Comp. Laws § 408.1011(a). In support of its argument that the FRA's specific regulations preempt any state enforcement predicated upon general employment standards, Plaintiff cites two cases and claims that both mandate dismissal of the first two citations brought against it in this matter.

In *Norfolk and Western Railway Co. v. Burns*, 587 F. Supp. 161 (E.D. Mich. 1984), MIOSHA issued citations against the plaintiff for (1) failure to post a required MIOSHA notice poster on site, (2) allowing loose railroad ties to create a hazard in the workplace, (3) not removing large rocks, broken railroad ties, and a partially buried air hose from work areas, and (4) failure to guard holes remaining after removal or replacement of railroad ties. 587 F. Supp. at 163. As in the instant dispute, the *Burns* plaintiff advanced two arguments for preemption–namely, that (1) the FRA's regulatory authority constituted a blanket preemption over any regulation whatsoever by a state workplace safety agency, and, alternatively, (2) that state safety regulations do not apply "to the tracks, roadbed and walkways" of a railroad operation. *Id.* at 167.

After considering the equivalent preemption provision that is currently contained in 49 U.S.C. § 20106, and cited above by this Court in the instant case, the *Burns* court also addressed legislative history from the Federal Register at the time of the FRSA's adoption. Specifically, the court focused on language indicating that Congress did not intend for the FRA's regulatory authority to subsume the Occupational Safety and Health Administration's ("OSHA's") ability to regulate general workplace safety issues. The relevant portion of the

8

Federal Register contained a general policy statement, indicating that: "FRA recognizes that OSHA currently is not precluded from exercising jurisdiction with respect to conditions not rooted in railroad operations nor so closely related to railroad operations as to require regulation by FRA in the interest of controlling predominant (sic) operational hazards." *Burns*, 587 F. Supp. at 165 (quoting 43 Fed. Reg. 10,587 (Mar. 14, 1978)). Since (1) the FRA preemption language permitted state regulation of railroad safety issues under certain circumstances, (2) the court was not aware of any other cases that had held the FRA exercised a blanket preemption over any state action in the safety arena, and (3) the legislative history militated against the plaintiff's position, that court held that there is no blanket preemption of *any and all* state regulation by virtue the FRA's authority.

The *Burns* court then addressed the plaintiff's argument regarding its particular citations being preempted because they touched on issues of track safety that the FRA directly regulated under 49 C.F.R. Part 213. The court had "no trouble in concluding that the federal regulations do treat [the subject matter of rails and track surface, including cross ties and ballast and all adjacent switches and appurtenances], that they treat it comprehensively, and that there has been a clear indication of an attempt to regulate in these areas in a manner which would preempt state regulation." *Burns*, 587 F. Supp. at 169. It then addressed, in a summary fashion, the merits of the plaintiff's challenges for each citation, but found that further factual development was necessary in order to make a final determination on the latter three citations.[3] Because the plaintiff had not yet

[3]The FRA did not preempt the MIOSHA regulation regarding notice posters, but might have preempted the other three citations, depending on whether the railroad ties that created the hazards were "an integral part or about to be an integral part of a railroad repair or railroad construction," (in which case, MIOSHA regulation would be

exhausted all state administrative remedies, the court dismissed the case in order for the plaintiff to pursue relief in that forum.  Such reasoning indicates that this Court must determine whether the items MIOSHA seeks to regulate here are related to railroad infrastructure and operations, but that MIOSHA is not entirely preempted from enforcing a General Duty Clause simply due to the fact that the FRA has authority to regulate some railroad-related safety items.

Plaintiff's second case on this point, *CSXT, Inc. v. Michigan Dep't of Labor*, 703 F. Supp. 44 (W.D. Mich. 1988), is also distinguishable and does not support its position that the FRA's authority preempts any and all MIOSHA General Duty Clause citations touching on the safety of railroad operations.  In that case, the plaintiff challenged several MIOSHA citations arising out of an employee's complaint that creosote-coated railroad ties constituted an occupational hazard.  Citing to *Burns*, the *CSXT* court noted that the facts before it established that the railroad ties at issue were either left on railcars until being installed, or were stacked in storage awaiting installation.  *CSXT*, 703 F. Supp. at 46.  In either case, the ties were "closely related to railroad operations," and the FRA's authority preempted any MIOSHA regulation of hazards associated with the subject railroad ties. *Id.*  As in *Burns*, the *CSXT* court did not apply a blanket preemption of any and all MIOSHA regulation based upon one of its General Duty Clauses, so this case also does not support Plaintiff's position on this point.  In both of those cases, the operative fact was the matters to be regulated, not the fact that MIOSHA was attempting to enforce a General Duty Clause as opposed to a more specific state regulation.  Thus, the Court concludes that there is no

preempted) or were "discarded and [were] merely a product of sloppy housekeeping" (in which case, MIOSHA could regulate such hazards).  *Burns*, 587 F. Supp. at 171.

preemption of Defendant's first two citations simply because they were based upon one of MIOSHA's General Duty Clauses.

### 2. The Court assumes that Defendant's citations fall within the subject matter of the FRA's authority to regulate

Moving to the root question of whether the subject matter of Defendant's citations is within the authority of the FRA, Defendant does not dispute that the FRA has broad power to regulate in the area of railroad safety issues by virtue of its authority under the FRSA. Thus, the primary issue before the Court is identifying the general subject matter of Defendant's citations.

The first and fourth citations address improper maintenance of the dogs attached to the rails themselves, as well as a failure to use appropriate safety measures while cleaning the dogs. Since the dogs are physically attached to the rails and assist in moving railcars riding on the rails, it is arguable that they are "appurtenances" to the rails which are within the FRA's ability to regulate pursuant to 49 C.F.R. Part 213, under the reasoning in *Burns*. 587 F. Supp. at 169. Similarly, the second and third citations address safety hazards related to moving railcars that result from blind spots around such cars as well as the risk of moving railcars striking stationary cars that employees are either loading, unloading, servicing or repairing. Railcars moving along tracks or resting on tracks for purposes that "are an integral part of railroad operations" could also constitute a subject matter that falls within the FRA's ability to regulate. *CSXT*, 703 F. Supp. at 46. In fact, the FRA has issued regulations covering railroad operating practices that address such situations in 49 C.F.R. Part 218.

Still, the Court is hesitant to conclude that these items are definitely within a subject

matter that the FRA has regulated due to the fact that the primary purpose of Defendant's citations is to address worker safety issues, rather than attempting to regulate the specifications of railroad track and equipment.  The Court recognizes that the dogs are physically attached to the railroad track, but the purpose of these mechanisms is to assist in the process of coke loading, and it does not appear that they would be a part of the general railroad track system outside of a particular type of industrial facility, such as Plaintiff's.  Furthermore, the other three citations focus on worker safety concerns, and any connection to railroad operations merely results from the fact that railcars are involved in this facet of Plaintiff's business.

At bottom, however, the Court is willing to assume, for sake of argument, that the subject matter of Defendant's citations falls within the FRA's authority to regulate.  Thus, the next question to address is whether the FRA has either expressly or negatively preempted Defendant from issuing the citations at issue in this case.

### 3.  Plaintiff does not assert that the FRA has expressly preempted Defendant from acting under the facts of this case

Although Plaintiff admits that "[i]t is . . . clear that the FRA has promulgated rules to cover the railroad safety subject matter that MIOSHA seeks to regulate[, t]he complicating factor in this case . . . is that the FRA has decided not to apply its railroad safety regulations to 'plant railroads.'" (Pl.'s Mot. at 18.)  The issue arises as a result of the scope of the FRA's regulations governing track safety standards under 49 C.F.R. Part 213 and railroad operating practices under 49 C.F.R. Part 218.  Specifically, FRA track safety standards do "not apply to track–(1) Located inside an installation which is not part of the general railroad system of transportation,"  49 C.F.R. § 213.3(b)(1), and its general railroad operating

practices do "not apply to– (1) A railroad that operates only on track inside an installation which is not part of the general railroad system of transportation," 49 C.F.R. § 218.3(b)(1). Such installations are referred to as "plant railroads," 49 C.F.R. Part 209, app. A; 63 Fed. Reg. 33,998 (June 22, 1998), and both parties use that shorthand term in their briefs to describe that portion of railroad track that is self-contained within an industrial plant facility, like a steel mill, that do not extend beyond its boundaries.[4]   Conversely, track and operations that are part of the main railroad system are termed a "general system railroad." (Pl.'s Mot. at 2.)  As a result, Plaintiff is not arguing that FRA regulations expressly preempt Defendant's citations arising out of Plaintiff's plant railroad operations.  Rather, Plaintiff contends that the FRA's exclusion of plant railroads from its track safety standards and general operating practices constitutes a statement that *any* state regulation of plant railroad safety issues is negatively preempted.[5]

### 4. The FRA has not negatively preempted Defendant's citations

The U.S. Supreme Court has indicated that the doctrine of negative preemption applies "'where failure of . . . federal officials affirmatively to exercise their full authority takes on the character of a ruling that no such regulation is appropriate or approved pursuant to the policy of the statute,' [and] States are [therefore] not permitted to use their police power to enact such a regulation." *Ray v. Atlantic Richfield Co.*, 435 U.S. 151, 178 (1978) (quoting *Bethlehem Steel Co. v. New York State Labor Relations Bd.*, 330 U.S. 767,

---

[4]Such track is still considered part of a plant railroad even though it is connected to the overall railroad system by way of a switch.  49 C.F.R. Part 213, app. A.

[5]It is worth noting that Plaintiff does not concede that its operation is a plant railroad, but is simply arguing that position for purposes of this motion.

774 (1947)).  Complicating the issue in the present case is the fact that the parties have not cited, nor has the Court's research uncovered, any federal cases dealing with negative preemption of state regulation against plant railroads.  That said, several cases exist that help to define the issue of when the FRA has negatively preempted state action on issues related to railroad equipment and operations.

The Sixth Circuit has affirmed a district court's decision to enjoin enforcement of an Ohio state law requiring railroad bridges to contain at least one walkway, finding that FRA action preempted the state law.  *Norfolk & Western*, 926 F.2d at 571.  In reaching its conclusion, that court cited two portions of the Federal Register expressing the FRA's determination, following a consideration of the benefits and burdens of imposing a walkway requirement for all bridges, that such a regulation was not warranted.  *Id.* at 570-71.  In particular, the court quoted the following text in support of its holding:

> [T]he issuance of a Federal rule requiring walkways on railroad bridges, trestles, and similar structures cannot be justified at the present time. First, any such rule would impose significant added burdens in terms of the large dollar cost to the railroad industry for construction of the walkways, the added hazard to persons and property and additional liability exposure for the railroads because of increased trespassing, and the possible decrease in overall railroad safety because of the diversion of resources from other maintenance and improvement projects. Secondly, neither the commenters nor the FRA has been able to demonstrate that such a rule would result in a definite or measurable improvement to railroad employee safety. Finally, if an employee safety problem does exist because of the lack of walkways in a particular area or on a particular structure, regulation by a State agency that is in a better position to assess the local need is the more appropriate response....

> 42 Fed.Reg. 22185 (May 2, 1977).

Moreover, the FRA reiterated these conclusions when it terminated rulemaking proceedings with respect to Railroad Occupational Safety and

Health Standards in 1978:

> FRA has exercised and continues to exercise its jurisdiction over the safety of railroad operations.... FRA has affirmatively determined that issuance of Federal regulations governing walkways on bridges is not warranted based on the projected cost of installation and the collateral safety problems which would be created.

> 43 Fed.Reg. 10586 (March 14, 1978).

*Id*. (citations in original).

Next, the Fifth and Ninth Circuits affirmed lower court decisions that enjoined enforcement of comparable state laws in Texas and Montana which required a caboose at the end of certain trains. *Burlington N. R.R. Co. v. Montana*, 880 F.2d 1104, 1106 (9th Cir. 1989); *Missouri Pac. R.R. v. R.R. Comm'n of Texas*, 850 F.2d 264, 267-68 (5th Cir. 1988). Historically, manned cabooses were necessary for safety reasons so that a crew member could visually inspect certain aspects of the train during operation. *Burlington Northern*, 880 F.2d at 1107. In reviewing whether modern electrical monitoring systems served as a sufficient substitute for actual human observation, both the *Burlington Northern* and *Missouri Pacific* courts cited portions of the following excerpt from the Federal Register, discussing the views of objectors who believed cabooses were still necessary for safety reasons:

> The major objection raised by commentors opposed to the proposed rule [that would not require a caboose] was the opinion that elimination of a caboose from the end of a train adversely affects safety. For example, the comments of the Railway Labor Executives' association and the United Transportation Union called for new requirements, e.g., overheated bearing/wheel detectors, train length restrictions, and dragging equipment detectors, to counteract the perceived safety detriment of cabooseless trains. *FRA does not agree with this line of analysis*. First, nothing in any current FRA regulation requires a caboose on any train, nor does anything in the final rule issued in this docket authorize the removal of a caboose. *The*

*determination on whether a railroad uses a caboose on any given line is made through the collective bargaining process. Moreover, the FRA does not consider the lack of a caboose to be a safety issue per se.* While this final rule may facilitate railroads' obtaining economic benefits from cabooseless operations, it does not in any way determine whether a caboose will or will not be used.

51 Fed. Reg. 17,300-01 (May 9, 1986) (emphasis added).

Both courts found that the FRA rulemaking decision preempted the state law at issue because of the FRA's determination that lack of a caboose did not constitute a safety issue that needed to be regulated.   In addition, the *Missouri Pacific* court also noted that the legislative history expressed an intention for the collective bargaining process to determine whether a caboose was necessary, rather than having state regulators make this decision. 850 F.2d at 267-68.

Returning to the instant case, Plaintiff claims that the FRA's exemption of plant railroads from its track safety standards in 49 C.F.R. Part 213 is a determination that state regulation is not necessary at such facilities, and that Defendant's citations are thus negatively preempted.  To resolve this question, the Court must first consider the legislative history to determine the purpose and extent of the FRA's exclusion of plant railroads from 49 C.F.R. Part 213's track safety standards.[6]  The Court finds the relevant portions to be:

*Plant Railroads and Industrial Spurs*

---

[6]A review of the legislative history behind the FRA's railroad operating practices contained in 49 C.F.R. Part 218 does not uncover a similar degree of specificity when it comes to the FRA's decision to exempt plant railroads from the coverage of that Part. *See* 44 Fed. Reg. 2174 (Jan. 10, 1979).  Presumably, this is why Plaintiff has focused its argument on the track safety standards of 49 C.F.R. Part 213, despite the fact that Part 213 does not address the other two citations that relate to the hazards of moving railcars in the vicinity of workers, to which Part 218 appears directly applicable.

In general, FRA has *elected not to exercise jurisdiction* over the safety of railroads that conduct their operations exclusively within an industrial or military installation. *FRA chose this self-imposed limitation* because such operations have not demonstrated the same degree and frequency of track problems found on tracks in the general system which are subject to heavier tonnages and more frequent use.

* * *

Since the enactment of the Federal Railroad Safety Act of 1970, FRA has had at its disposal statutory authority to issue emergency orders to repair or discontinue use of industrial or plant trackage should the agency find that conditions of the track pose a hazard of death or injury. See 49 U.S.C. § 20901. It is FRA's opinion that this emergency order authority is sufficient power to ensure track safety within plants, as well as other installations (e.g., military installations). However, if conditions or events in the future tend to demonstrate that track safety within plants or installations should be more specifically regulated, FRA will seek to change the applicability of this Part in a future rulemaking.

63 Fed. Reg. 33,998 (June 22, 1998) (italicized heading in original, emphasis added).

*Section 213.3–Application*

* * *

Under this policy, FRA will not hold plant owners responsible for compliance with ancillary track safety provisions such as the requirements for recordkeeping or inspection frequencies. However, FRA will judge the safety of the plant railroad against the substantive safety requirements in those standards to assess the need to invoke its emergency order authority against the plant owner.

*Id.* at 34,001 (italicized heading in original)

It is important to note that FRA's exercise of its regulatory authority on a given matter does not preclude it from subsequently amending its regulations on that subject to bring in railroads originally excluded. More important, the self-imposed restrictions on FRA's exercise of regulatory authority in no way constrain its exercise of emergency order authority under section 203 of the Safety Act. That authority was designed to deal with imminent hazards not dealt with by existing regulations and/or so dangerous as to require immediate, ex parte action on the government's part. Thus, a railroad excluded from the reach of any of FRA's regulations is fully within the reach of FRA's emergency order authority, which is coextensive with FRA's

statutory jurisdiction over all railroads.

49 C.F.R. Part 209, app. A.

As a result of this legislative history and language from an appendix to the FRA's track safety standards, Plaintiff argues that the FRA has determined that plant railroads do not need to be subject to its regulations, and therefore, that Defendant's citations are negatively preempted. In comparing these excerpts of the legislative history that the *Norfolk & Western* court cited with regards to walkways on railway bridges, and the *Burlington Northern* and *Missouri Pacific* courts cited on caboose safety issues, it is apparent that the FRA has not taken the same action in all of these circumstances. To be sure, the FRA has expressly exempted plant railroads from the general track safety standards of 49 C.F.R. Part 213 that apply to general system railroads in favor of using its emergency order authority to address track issues at plant railroads that are so serious that they constitute an immediate threat to worker safety. Furthermore, plant railroads are also exempted from the railroad operating practice requirements of 49 C.F.R. Part 218, and it is also plain to see that the legislative history indicates some degree of consideration went into the voluntary decision to decline jurisdiction over plant railroads in these two areas of the FRA's jurisdiction.

That said, the history on the issue of bridge walkways and cabooses indicates a much stronger conclusion by the FRA on that issue than the question of plant railroad regulation at issue here. With regards to walkways, the FRA explicitly considered the benefits and burdens of a rule requiring all bridges to be equipped with walkways, but determined that the costs of such a rule would outweigh any potential benefits. To reiterate: "FRA has affirmatively determined that *issuance of Federal regulations governing walkways on*

18

*bridges is not warranted* based on the projected cost of installation and the collateral safety problems which would be created." 43 Fed. Reg. 10,586 (Mar. 14, 1978) (emphasis added). From this and other statements in the legislative history quoted in *Norfolk & Western*, any reader could see that the FRA specifically determined that regulations requiring such walkways "cannot be justified," and gave particular reasons to support its assertion that the costs of regulation would outweigh any benefits. 42 Fed. Reg. 22,185 (May 2, 1977). Similarly, the FRA did "not consider the lack of a caboose to be a safety issue per se," and specifically stated that "[t]he determination on whether a railroad uses a caboose on any given line is made through the collective bargaining process." 51 Fed. Reg. 17,300-01 (May 9, 1986). Thus, any state attempt to regulate these subject matters would be negatively preempted.

The FRA's language exempting plant railroads from its track safety standards and railroad operating practices does not reach the same level of particularity, however. Rather, that verbiage speaks of "elect[ing] not to exercise jurisdiction," and a "self-imposed limitation" due to the fact that plant railroads "have not demonstrated the same degree and frequency of track problems found on tracks in the general system which are subject to heavier tonnages and more frequent use." 63 Fed. Reg. 33,998 (June 22, 1998). While this is a reason behind the FRA's decision in this area, nothing indicates that any safety regulations over plant railroads would be completely inappropriate, as the FRA determined was the case for bridge walkways, nor did the FRA specifically allocate authority to the collective bargaining process, to the apparent exclusion of state regulation, as it did with cabooses.

This is particularly so in light of the FRA's acknowledgment that OSHA maintains a

19

level of overlapping jurisdiction to address general workplace safety issues that apply to all industrial workplaces, including railroads. Specifically, the FRA noted that it did not make sense for that agency to promulgate an overlapping set of regulations to cover more general workplace hazards that were already within OSHA's jurisdiction. *See* 43 Fed. Reg. 10,584 (Mar. 14, 1978). This indicates that simply because a railroad is under the FRA's authority when it comes to workplace safety issues that are closely tied to actual railroad operations, OSHA would still have jurisdiction to regulate safety matters that would be present in virtually any industrial setting. Taken to its logical conclusion, however, Plaintiff's argument would apparently preclude *any* workplace safety regulations involving plant railroad operations simply because the FRA has determined not to exercise its authority over such facilities. Based upon the FRA's acknowledgment of OSHA's role in ensuring general worker safety, it is not reasonable to conclude that the FRA's jurisdiction over plant railroads was intended to leave those workers without any regulatory protection and oversight whatsoever for hazards that were somewhat related to railroad operations.

To conclude, the Court finds that the FRA's decision not to apply its track safety standards and railroad operating practices to plant railroads is insufficient to reach a conclusion that Defendant is negatively preempted from regulating worker safety matters at such facilities. Although Defendant's citations arguably cover matters that are intimately intertwined with railroad operations, nothing in the cited regulations or legislative history support a position that MIOSHA is either expressly or negatively preempted from taking action here under 49 C.F.R. Part 213 or Part 218. Accordingly, the FRA regulations do not cover the subject matter at issue in this case, so the first savings clause within the FRSA preemption provision applies, and because federal law does not cover this subject matter,

Defendant is not preempted from issuing its own regulations on the topic. Plaintiff's motion for summary judgment is DENIED and judgment is GRANTED in Defendant's favor on Plaintiff's complaint for declaratory and injunctive relief.[7]

### D. Plaintiff's Motion to Strike

Plaintiff seeks to strike Exhibit 2 to Defendant's response to Plaintiff's motion for summary judgment. This document is an apparent opinion of Mr. Mark Lindsey, who identifies himself as FRA Chief Counsel, that Plaintiff's facility falls under OSHA's jurisdiction rather than that of the FRA. As the Court has reached its conclusions described above without consideration of the document that Plaintiff seeks to have stricken, the Court DENIES AS MOOT Plaintiff's motion to strike.

## IV. CONCLUSION

Being fully advised in the premises, having read the pleadings, and for the reasons set forth above, the Court hereby orders as follows: Plaintiff's motion for summary judgment is DENIED, Plaintiff's motion to strike is DENIED AS MOOT, and judgment is GRANTED favor of Defendant on Plaintiff's complaint for declaratory and injunctive relief.

SO ORDERED.

_____

[7]This conclusion does not change with regards to Defendant's use of its General Duty Clause to support two of the citations at issue in this case. On this point, Plaintiff argues that the FRA's reservation of its emergency order authority to regulate particularly serious track hazards at plant railroads subsumes Defendant's ability to apply its General Duty Clauses here. Still, the Court's overall holding that the FRA has not negatively preempted state regulatory action over plant railroads in this fashion was based upon the lack of any direct indication that the agency felt *no* regulation of plant railroad operations was appropriate. Whether the FRA expressed an intent to regulate certain grave hazards in the future has no bearing on the bottom-line conclusion that the FRA did not negatively preempt Defendant's actions here.

s/Nancy G. Edmunds
Nancy G. Edmunds
United States District Judge

Dated: July 31, 2007

I hereby certify that a copy of the foregoing document was served upon counsel of record on July 31, 2007, by electronic and/or ordinary mail.

s/Carol A. Hemeyer
Case Manager